FILED IN THE ALASKA TRIAL COURTS ON 1/30/2026

Goriune Dudukgian, AK Bar No. 0506051
**NORTHERN JUSTICE PROJECT, LLC**
406 G Street, Suite 207
Anchorage, AK 99501
Tel: (907) 308-3395
Fax: (866) 813-8645
Email: gdudukgian@njp-law.com

Attorneys for Plaintiff

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

FOURTH JUDICIAL DISTRICT AT FAIRBANKS

| | |
|---|---|
| ANIKA PINZNER<br><br>Plaintiff,<br><br>vs.<br><br>UNIVERSITY OF ALASKA,<br><br>Defendant. | Case No. 4FA-26-01208CI |

# COMPLAINT

COMES NOW the plaintiff, Anika Pinzner, by and through counsel, the Northern Justice Project, LLC, alleging and requesting relief as follows:

## PRELIMINARY STATEMENT

1. The University of Alaska (hereinafter "the University" or "UA System") has a long and well-documented history of turning a blind eye to students' complaints of sex discrimination. In February 2017, the United States Department of Education's Office for Civil Rights ("OCR") found after a comprehensive compliance review that the University was violating Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), by mishandling sexual harassment complaints, including reports of sexual

assault and sexual violence, and failing to protect its students and staff from discrimination on the basis of sex.

2. More specifically, OCR found that the University was violating Title IX's mandate to provide *prompt* resolution of discrimination complaints. For example, the case processing times by the University of Alaska Fairbanks ("UAF") averaged 122 days during the 2013-14 academic year and 155 days during the 2014-15 academic year. The longest delay was a whopping 567 days. Additionally, OCR found that the University was routinely violating Title IX by failing to conduct or complete investigations, failing to provide adequate investigations and notices of outcome, failing to provide adequate interim supportive measures, failing to prevent retaliation, and failing to assess hostile environment.

3. Despite the University's assurances to the federal government, these egregious failures have continued until the present time, as demonstrated by the University's indifferent response to Plaintiff Anika Pinzner's discrimination complaint.

4. Plaintiff is a graduate student at UAF. In September 2022, she reported a long and troubling history of sex-based discrimination and harassment, including an assault with a snowmachine, by her faculty advisor, Matthew Sturm. The University commenced a formal investigation of Sturm in February 2024 and ultimately substantiated Plaintiff's allegations.

5. In June 2025, the University found that Sturm subjected Plaintiff to harassing conduct on the basis of her sex that was severe and pervasive and created a discriminatory hostile environment. The University also determined that Sturm retaliated

against Plaintiff after learning about her discrimination complaint.

6. Inexplicably, it has been more than 720 days since the University commenced its formal investigation of Plaintiff's complaint and nearly eight months since the University made a final determination that illegal discrimination had occurred, but the University *still* has not offered the Plaintiff any remedy for the violations of her civil rights. The University also failed to offer Plaintiff appropriate interim supportive measures during its delayed processing of Plaintiff's complaint.

7. The University's failure to respond promptly and effectively to Plaintiff's discrimination complaint subjected her to years of further harassment and retaliation by Sturm. Simply put, Plaintiff has not felt safe on campus and while conducting University sponsored field research. Thus, Plaintiff has been forced to isolate herself at home, away from her new faculty advisor, colleagues and collaborators, computers and instruments, and has missed out on numerous lectures, seminars, trainings, and networking events on the UAF campus. As a result, Plaintiff has suffered lost educational opportunities and benefits, impaired reputation, lost income, and ongoing detrimental impacts on her physical and emotional health, including a diagnosis of Post-Traumatic Stress Disorder ("PTSD").

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over this action pursuant to AS 22.10.020.

9. Venue is proper under AS 22.10.030 and Alaska Civil Rule 3(c) as Plaintiff's claims arose within the Fourth Judicial District.

## PARTIES

10. Plaintiff Anika Pinzner is a German citizen who currently resides in Fairbanks, Alaska.

11. Defendant University of Alaska is a public corporation established under the Alaska Constitution. *See* Alaska Const. art. VII, § 2. The University is governed by its Board of Regents.

## GENERAL ALLEGATIONS

12. The University operates a statewide system of public higher education. The UA System includes three separately accredited universities with community campuses and satellite campuses across Alaska. The University has a current enrollment of more than 27,800 students and employs more than 7,000 people throughout the state. The UA system provides 90% of Alaska's post-secondary education.

13. The University of Alaska Fairbanks is one of the accredited universities operated by the UA System. According to the mission statement on its website, UAF is "a Land, Sea, and Space Grant university and an international center for research, education, and the arts, emphasizing the circumpolar North and its diverse peoples. UAF integrates teaching, research, and public service as it educates students for active citizenship and prepares them for lifelong learning and careers." UAF is renowned for its Arctic research.

14. UAF has a current enrollment of 7,486 students from 52 states and territories and 51 countries. It has a staff of 1,933 full- and part-time employees, including

831 student employees.

**The Discrimination Faced by Plaintiff**

15. Plaintiff was hosted as a visiting researcher at UAF from May 2018 until April 2019. Plaintiff worked on a snow impurities research project while pursuing a joint master's degree from the University of Copenhagen, Denmark and The Swedish University of Agricultural Sciences in Uppsala, Sweden.

16. During all relevant times, Matthew Sturm has been an employee of the University as a non-tenured research professor of geophysics at UAF. As such, during all relevant times, the University has exercised substantial control over Sturm.

17. Sturm is affiliated with UAF's Geophysical Institute and his research has focused on snow and ice. After seeing Sturm deliver a keynote speech at the American Geophyiscal Union Conference in December 2018, Plaintiff asked Sturm to take her on as a PhD student at UAF. Sturm agreed to do so.

18. On May 6, 2019, Plaintiff was formally admitted to UAF as a graduate student in the Department of Geosciences. Plaintiff began her PhD program in the fall of 2019, with Sturm as her faculty advisor. Plaintiff was also employed by the University as a Graduate Research Assistant, with Sturm as her direct supervisor. From fall 2019 to spring 2023, Sturm chaired Plaintiff's graduate advisory committee and supervised her employment. Plaintiff was the only doctoral student for whom Sturm performed these dual roles during this time period.

19. In order to obtain a PhD in Geoscience, Plaintiff was required to complete coursework, pass comprehensive exams, and obtain approval for a thesis project, which

required the publication of three scientific papers. Graduate students are guided through that process by their advisor and an advisory committee consisting of at least three additional faculty members. The advisor must consent to the assignment, is responsible for chairing the committee, and is a critical factor in the student's success.

20. Starting in February 2020, Plaintiff experienced harassing conduct by Sturm on the basis of sex that was so severe, pervasive, and objectively offensive that it created a hostile educational environment. Sturm's conduct created an intimidating, hostile, and unsafe environment and deprived Plaintiff of the educational opportunities and benefits provided by the University. Sturm's harassing conduct had a continued negative effect on Plaintiff's education and her access to school-related resources. Witnesses who observed Sturm's treatment of Plaintiff have described it as "egregious."

21. There is an inherent power differential between advisors and graduate students. And here, the fact that Plaintiff's ability to remain in the United States was tied to her student visa made her particularly vulnerable to Sturm's harassment.

22. Sturm's discriminatory treatment of Plaintiff included (i) frequently berating, scolding, demeaning, and yelling at Plaintiff on the campus of UAF and during field research and outreach events; (ii) trying to appropriate Plaintiff's paper and abusing his role as the corresponding author; (iii) setting arbitrary and impossible deadlines and work quality standards, then threatening Plaintiff that she would not get her doctorate (and would effectively have to leave the country) if she did not meet his arbitrary demands; (iv) denigrating and humiliating Plaintiff in front of other faculty and professionals in the field; (v) excluding Plaintiff from instruction and educational

opportunities that he shared with male students; (vi) isolating Plaintiff from colleagues; and (vii) blocking Plaintiff from professional development opportunities.

23. Sturm's harassment of Plaintiff also included physical intimidation. During field work in April 2022, Sturm became irate when Plaintiff and another female colleague asked to take a break. Sturm assaulted Plaintiff by driving his snowmachine directly at Plaintiff at high speed, stopped dangerously close, jumped off, and started screaming in Plaintiff's face. Plaintiff was visibly shaken and experienced chest pains after the incident.

24. Sturm's treatment of Plaintiff was based on gendered stereotypes about women. Sturm explicitly identified Plaintiff's sex in connection with his behavioral expectations of her. He mandated protocols that applied only to women in the field, such as never being alone with male residents in remote villages, and he then scolded Plaintiff for not following these gendered rules. He also chastised Plaintiff for "flirting" when she merely accepted a short snowmachine ride from an Alaska Native man in a village during fieldwork.

25. Sturm frequently made jokes and derogatory comments about women in the field, particularly as it related to toileting and menstruation. He initially denied a request to purchase a pop-up tent that women could use for privately toileting in the field, stating that the "standard" approach to toileting in the field was simply to ask everyone to turn their backs.

26. Sturm unfairly assigned field tasks based on gender. For example, Sturm permitted only the male researchers to drive snowmachines alone and carry rifles in the

field, even though a female researcher on the team had been the best shot during their training and most participants had the same snowmachine experience.

27. Sturm also made frequent comments about Plaintiff's and other female scientists' gender and appearance, using sexist stereotypes to interfere with Plaintiff's scientific work and career advancement, including by pressuring her to abandon professional opportunities. For example, he coerced Plaintiff to drop out of a prestigious opportunity for field research with a group of leading researchers in her field because he did not think that Plaintiff would be taken seriously as a scientist as "a blond woman" doing field work where people would see her "dressed in hand-me-downs." Sturm told Plaintiff that she needed to "write a good paper first" in order to show people that she "has a brain," instead of just being "an attractive blond woman."

28. Sturm criticized the only woman on Plaintiff's graduate advisory committee for being "insufficiently hardnosed." Sturm also criticized another female researcher in the Geophyiscal Institute as lacking a "killer instinct." Sturm denigrated these women for not possessing traits traditionally associated with masculinity.

29. In sum, Sturm targeted abusive workplace behavior specifically at Plaintiff while not holding males who were also in the field to the same expectations or subjecting them to his abusive behavior.

**The Retaliation Faced by Plaintiff**

30. Plaintiff first reported Sturm's discriminatory conduct to UAF's Center for Student Rights and Responsibilities in the fall of 2022. However, Plaintiff was leery of moving forward with a formal complaint because Sturm was still her advisor and the

corresponding author for her first paper. Plaintiff was worried about potential retaliation by Sturm that would impact the publication of her paper.

31. On November 21, 2022, UAF's Deputy Title IX Coordinator, K. "Parker" Leland, emailed Plaintiff that "the University of Alaska Fairbanks's Department of Equity and Compliance (UAF's DE&C) received a report that you may have experienced negative behavior or actions from your faculty advisor which you believe are unrelated to your performance as a graduate student. The DE&C had opened an inquiry into this report to determine whether to conduct an administrative investigation or take other administrative action. . . . At this time, we plan to close the inquiry into this report, as you have requested."

32. Although DE&C closed its official investigation of Plaintiff's complaint in November 2022, Plaintiff continued to meet with various UAF administrators and investigators throughout 2023 regarding Sturm's ongoing harassment and discrimination.

33. Plaintiff's fears of retaliation by Sturm were justified. Sturm found out about Plaintiff's complaint in February 2023. On February 14, 2023, Sturm called and yelled at Plaintiff on the phone and accused her of being a "bullshitter." The next day, Sturm emailed an administrator at the Geophysical Institute and stated that he was "stepping off" Plaintiff's committee. Sturm informed Plaintiff of his decision to "drop" her as a student on February 22, 2023. In a subsequent conversation with Geophysical Institute administrators, Sturm said that he had "fired" Plaintiff and falsely stated that he had written 90% of her paper.

34. Sturm insisted that Plaintiff meet him alone for lunch off campus at East

Ramp Pizza in Fairbanks on March 2, 2023. During the lunch, Sturm used coercive and intimidating language and warned Plaintiff not to create a "disaster" which would impact Plaintiff's academic standing and future work. Sturm then made a threatening remark about the involvement of "pistols and legal action." Sturm also threatened to appropriate Plaintiff's first dissertation paper (by removing Plaintiff's name as the first author) and said that nobody would believe her narrative of events. Plaintiff was so visibly shaken by Sturm's behavior at the restaurant that acquaintances who happened to observe the interaction checked in with her afterward to see if she was okay.

35. Plaintiff had formally advanced to doctoral candidacy in January 2023. However, because Sturm's harassment and retaliation had become intolerable, Plaintiff was forced to change the course of her doctorate. Plaintiff switched advisors in March 2023, which forced her to change the topics and funding sources for her second and third papers and abandon months of prior work with Sturm. As a result, Plaintiff's progress toward her PhD was significantly delayed.

36. Even after Plaintiff changed advisors, Sturm continued to retaliate against her by interfering with her authorship and publication of her first paper. On June 10, 2023, Plaintiff asked Strum for access to the manuscript of Plaintiff's paper that he had submitted for publication. Sturm refused to give Plaintiff access to the manuscript and stopped communicating with Plaintiff about the paper. Sturm also denied Plaintiff's request to submit her revised manuscript, until two other faculty members ultimately intervened. These actions delayed Plaintiff's progress and the ultimate publication date of her paper.

## The University's Botched and Delayed Investigation

37. In January 2024, Plaintiff met with Kaydee Van Flein, the Executive Director of UAF's Office of Rights, Compliance and Accountability ("ORCA"),[1] to review a draft notice of investigation.

38. On February 7, 2024, ORCA issued a notice to Plaintiff and Sturm that it was "conducting an administrative investigation of an allegation of behaviors that may constitute a violation of civil rights." The notice stated that "Complainant Anika Pinzner alleges that Matthew Sturm discriminated against her on the basis of her sex/gender and national origin starting in the spring of 2019 and continuing through the spring of 2023." With regard to the alleged sex/gender discrimination, the notice gave the following examples of discrimination:

> Commenting on women's lack of suitability for positions based on their emotions or status as mothers; impeding the progression of her PhD on multiple occasions; expecting Complainant to cover Respondent's work while he was out without notice; having threatening/offensive outbursts towards Complainant; belittling Complainant in the presence of others; stating that work she completed was not of sufficient quality; making comments about women's hygienic needs in the field; and not giving recognition to Complainant for her accomplishments, while giving recognition to her male counterparts.

---

[1] In August 2023, the Center for Student Rights and Responsibilities and the Department of Equity and Compliance were combined into the Office of Rights, Compliance and Accountability. ORCA's focus is "preserving individual rights, ensuring compliance with policy and law, and fostering accountability," with the overall goal of providing "a respectful and welcoming university environment." ORCA now serves as a single point of contact for matters involving Title IX, discrimination, student behavioral intervention, crisis management, and the Student CARE Team.

39. ORCA assigned Investigator Scott Davidson to Plaintiff's case. During his interviews of the Plaintiff, Davidson consistently downplayed the severity of Sturm's behaviors, remarking dismissively that "at least it's not a sexual assault case" and that Sturm "was not sexually violating people left and right." After Plaintiff raised concerns about Davidson's ability to conduct an impartial investigation, ORCA assigned Ben Stevens as the investigator. However, ORCA then re-assigned the case back to Davidson without notifying Plaintiff of the change or obtaining her consent, which posed a conflict of interest given Davidson's knowledge of Plaintiff's complaint against him.

40. Plaintiff suggested using an external investigator to obtain an objective review of her case. However, Van Flein discouraged Plaintiff from pursuing this option, stating that there would be long delays of up to six years in the process, and suggesting that external law firms would mishandle the investigation due to their "lack of understanding of the University's inner workings."

41. On May 20, 2024, ORCA issued its original Investigative Report, which found that Sturm's treatment of Plaintiff was "inappropriate" and "egregious," but that Sturm had <u>not</u> engaged in discriminatory behavior towards Plaintiff.

42. On May 28, 2024, Plaintiff requested a review of Davidson's Investigative Report. Margo Griffith – who was previously employed as UAF's Equity and Compliance director until February 2023 – was appointed to review Davidson's investigative process and his finding that Strum did not discriminate against Plaintiff.

43. On August 14, 2024, Griffith issued a scathing memorandum to UAF Chancellor Daniel M. White which identified numerous critical errors in ORCA's

investigative process. The Griffith memorandum found that the original investigative report failed to clearly identify Plaintiff's allegations. Davidson failed to "thoroughly investigate and analyze the allegations," including his failure to recognize Plaintiff's retaliation complaint. Davidson also failed to interview critical witnesses, "inappropriately considered facts and circumstances irrelevant to the elements of the discrimination claims alleged, . . . relied on speculation to make findings, and failed to consider potential biases of witnesses in weighing their testimony." The investigative findings "failed to discuss the power dynamics inherent in graduate student – professor relationships, as well as the power dynamics involved when a student is present on an international visa." In short, the Griffith memorandum found that Davidson "made factual errors, applied incorrect standards, and reached conclusions that are not supported by the evidence." For all of these reasons, Griffith recommended that the Chancellor remand the case to ORCA "for further investigation and a complete analysis of all allegations raised" by the Plaintiff. Griffith also recommended that the Chancellor direct other units of UAF, including the Provost's Office, Office of Research Integrity, and Human Resources to investigate Sturm's behaviors for appropriate action.

44. On August 20, 2024, Chancellor White adopted the recommendations of the Griffith memorandum, declined to adopt the investigative report, and remanded the matter to ORCA "for further investigation and analysis as described in the reviewer's recommendation." Chancellor White further directed "Chief of Staff Nickole Conley to refer the 'collateral behaviors' to the identified offices to review and determine whether any of the alleged conduct requires additional administrative response."

45. The University hired an external investigator, attorney Lea Filippi of the firm Sedor Wendlandt Evans Filippi, to conduct a supplemental investigation of Plaintiff's discrimination complaint. Filippi conducted a comprehensive investigation, which included reviewing the entire record of the original investigation; re-interviewing and collecting additional information from both Plaintiff and Sturm; and interviewing additional witnesses who had not been contacted during the original investigation.

46. On April 11, 2025, Filippi issued a report of the findings of her supplemental investigation. In short, Filippi found that the preponderance of the evidence supported a finding that Sturm discriminated against Plaintiff based on her sex, and that Sturm retaliated against Plaintiff. Filippi further found that Sturm's discrimination harmed Plaintiff by impairing her educational experience and professional development.

47. The University adopted the findings of the Filippi report on April 16, 2025.

48. ORCA's initial faulty investigation of Plaintiff's discrimination complaint, including but not limited to the assignment of a biased and incompetent lead investigator (Davidson), delayed the final resolution of Plaintiff's complaint by 11 months, which is significantly longer than the "reasonably prompt timeframe" of 180 days under the University's Title IX policy for the *conclusion* of the grievance process, including appeals. And yet, the delays continued for almost another full year.

49. On May 7, 2025, Sturm requested a formal review of Filippi's supplemental investigation report. Chancellor White appointed Anupma Prakash, UAF's Provost and Executive Vice Chancellor, as the reviewer.

50. In a report dated May 30, 2025, Prakash found that Filippi's report

"provided a well-documented summary of the case" and that the investigative process employed by Filippi was "clear and logical." Prakash further found that the "rationale behind each step [of Filippi's analysis] was thoroughly explained, with references to relevant court cases provided where appropriate." Prakash noted that Filippi "did not solely rely on witness records from the prior investigation resulting in the May 2024 report, but also carried out additional investigational activities." Based on the "comprehensiveness of the investigational activities, as well as the thoroughness of the report," Prakash concluded that Filippi's findings were "well-founded that the preponderance of the evidence established that [Sturm] engaged in sex-based discrimination and retaliated against the [Plaintiff] as each is defined in applicable laws, BOR Policies and University Regulations." Thus, Prakash recommended that Chancellor White adopt the findings of Filippi's supplemental investigation, and that "the University take necessary disciplinary actions on the basis of the findings and determinations in the supplemental Investigation Report in accordance with relevant BOR Policies, University Regulations, and any applicable collectively bargained terms."

51. On June 5, 2025, Chancellor White upheld the findings of the supplemental investigation. Chancellor White's decision informed Sturm that he could seek further review of the findings by the UA System president or could seek judicial review by filing an appeal with the Superior Court of the State of Alaska.

52. Sturm did *not* seek any further review of Chancellor White's June 5, 2025 decision. Thus, the findings of sex discrimination and retaliation by Sturm are now final.

## **The University's Failure to Remediate the Discrimination**

53. Whenever the University's investigation results in a final determination that sex discrimination occurred, the University's Title IX Coordinator must "coordinate the provision and implementation of remedies to a complainant and other persons the recipient identifies as having had equal access to the [University's] education program or activity limited or denied by sex discrimination, coordinate the imposition of any disciplinary sanctions on a respondent, including notification to the complainant of any such disciplinary sanctions, and require the Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the [University's] education program or activity . . . ." 34 C.F.R. § 106.45(h)(3).

54. After Chancellor White upheld the investigation findings in June 2025, Van Flein emailed Plaintiff and requested to schedule a meeting with Plaintiff to discuss "appropriate responsive actions" and "a meaningful resolution to this complaint and subsequent findings." Van Flein's email stated that she was "presently the point of contact for support and will remain so until these meetings of impact and remediation have taken place."

55. Plaintiff met in person with Van Flein and two other UAF administrators on July 22, 2025, to discuss possible remedial actions. Plaintiff followed up by email on August 6, August 19, and August 28, 2025, asking about the status of any remedial measures that would be offered by the University. Plaintiff has not received *any* update from the University since August 2025 on the status of any remedial measures.

56. It has now been more than seven months since the University made a final

determination of sex discrimination and retaliation by one of its employees against Plaintiff. Yet Plaintiff still has not received, or even been offered, any remedies from the University to make her whole from Sturm's misconduct.

57. Title IX requires the University to respond "promptly and effectively" to a complaint of conduct that constitutes sex discrimination in its educational program. 34 C.F.R. § 106.44(a)(1). The University must "adopt, publish, and implement grievance procedures . . . that provide for the *prompt* and equitable resolution of complaints made by students, employees, or other individuals who are participating or attempting to participate in the recipient's education program or activity." 34 C.F.R. § 106.8(b)(2) (emphasis added). University Regulation R01.04.160(A) implements this mandate by defining "[a] reasonably prompt timeframe for conclusion of the grievance process, including time for filing and resolving appeals and participation in any informal resolution processes" as "180 days."

58. The University unreasonably dragged out the investigation of Plaintiff's sex discrimination complaint well beyond the deadline imposed by its own policy and any reasonable measure of promptness. It has been more than 720 days since the University commenced its formal investigation of Plaintiff's complaint. Yet, as of the filing date of this complaint, the University has not taken prompt and effective steps to restore or preserve equal access to the University's education program or activity. No remedial efforts have been made to offer additional supportive measures, or to make permanent the meager supportive measures previously imposed, or otherwise taking any action identified in the University's regulations governing supportive measures. Furthermore,

upon information and belief, the University has not imposed any disciplinary or punitive measures against Sturm as of the date of this complaint.

**The University's Failure to Implement Interim Protective Measures**

59. Both Title IX, 34 C.F.R. § 106.44(g), and the University's own policies and regulations, P01.04.070 and R01.04.070, require the University to offer and coordinate reasonable and appropriate interim supportive measures to protect a complainant's safety and educational environment during the course of an investigation. In 2017, OCR found that the University was routinely offering only "limited and sometimes improper interim measures," and also failing to "properly implement interim relief identified as necessary (either completely or in a timely fashion)." Plaintiff's experience shows that the University is still deliberately indifferent to implementing appropriate and timely interim supportive measures in order to protect complainants from continued discrimination and retaliation.

60. On April 12, 2024, the University issued a "no contact" directive to Sturm which directed him to avoid "direct contact and indirect contact" with Plaintiff, including "talking to or joining a group engaged in a conversation where [Plaintiff] was already present, walking toward intentionally, and lingering in spaces the two of you are both occupying."

61. Sturm repeatedly violated the University's "no contact" order with impunity. For example, Sturm decided at the last minute to join field work in Utqiagvik during the same week that Plaintiff was scheduled to be there from April 13–20, 2024. Sturm was assigned to be housed in the same building as Plaintiff until her new faculty

advisor, Dr. Andy Mahoney, intervened and insisted that Sturm be housed in a different, but nearby, building. Even after Mahoney's intervention, Sturm attempted to enter Plaintiff's building but was stopped from entering by a visiting researcher. Sturm was also frequently in proximity of Plaintiff on snowmachine trails, armed with a rifle. This effectively barred Plaintiff from moving freely around the fieldwork site and impeded her ability to complete her own research.

62. In April 2024, Plaintiff moved her office from the West Ridge Research Building ("WRRB") to the fourth floor of the Elvey Building in order to create distance from Sturm and avoid any encounters on campus. Before Plaintiff moved her office, Sturm had rarely gone to the fourth floor of the Elvey Building. Thereafter, Sturm began frequenting the fourth floor of the Elvey Building without any legitimate reason for being there. On April 22, 2024, Sturm was observed by witnesses loitering in the space directly adjacent to Plaintiff's office.

63. On April 25, 2024, Sturm approached and spoke with the Plaintiff and continued to stand close behind her during a Geophysical Institute awards ceremony. Plaintiff felt unsafe around Sturm and immediately left the ceremony, depriving her of an important networking opportunity.

64. Plaintiff notified University administrators after each violation to ask for additional support and enforcement of the no contact directive. However, the University did not take any enforcement measures. As a result, Plaintiff was constantly in fear for her safety. She stopped coming to the UAF campus, except for brief visits when absolutely necessary. Plaintiff was isolated from her faculty advisor and colleagues, could

not conveniently access the Geophysical Institute's computers and instruments, and missed out on numerous professional development opportunities, such as conferences and networking events on campus.

65. Plaintiff met with the University between July 22, 2024 and October 17, 2024 in a series of meetings to discuss the implementation of additional interim supportive measures to protect Plaintiff's safety and well-being during the course of the University's investigation. These meetings included Van Flein, the Executive Director of ORCA; Kathy Catron, UAF's Chief of Police; and Danielle Foster, UAF's Director of Labor and Employee Relations. During these meetings and in follow-up emails, Plaintiff asked the University to provide additional supportive measures, including the installation of a lock, panic button, and door spy in her office; shower access in a different building (because the Geophysical Institute showers were close to Sturm's office); moving Sturm's office to another part of campus; notifying Plaintiff of Sturm's out-of-town travel schedule; barring Sturm from performing field work at the same time and location as Plaintiff; providing Plaintiff with campus escort services; and restricting Sturm's access to the Elvey Building or, at a minimum, from the fourth floor of the building where Plaintiff's office is located.

66. During the July 22, 2024 meeting, both Van Flein and Catron agreed that the supportive measures requested by Plaintiff were reasonable and appropriate. However, the University subsequently failed to implement the vast majority of the measures discussed. The few interim supportive measures that were actually offered by the University were ineffectual, unreasonably burdened the Plaintiff, were only

implemented after significant delay, and were rarely enforced.

67. The University did not install a door spy until October 2024, more than eight months after the University started its investigation of Sturm. The University never installed a panic button in Plaintiff's office. The University did not provide Plaintiff access to alternative showers outside of the Geophysical Institute. The University did not consistently inform Plaintiff of Sturm's out-of-town travel schedule. The University did not move Sturm's office to another location on campus. The University ignored numerous requests from Plaintiff for safety personnel when she was required to be on the UAF campus. And the University did not restrict Sturm's access to the Elvey Building or even the fourth floor of the building.

68. Van Flein informed Plaintiff that such measures could not be implemented until the University's investigation was concluded, even though Sturm and other witnesses had already corroborated Plaintiff's allegations of assault and other egregious behaviors. Van Flein also sought to restrict Plaintiff's access to the WRRB building – where her faculty advisor's office and field instruments were located – even though Plaintiff was not accused of any wrongdoing.

69. Plaintiff also experienced institutional pressure from the University leave her program or abandon her complaint rather than receive protection from Sturm. From the outset, Van Flein told Plaintiff that the University could not offer adequate protection if she pursued a formal investigation against Sturm. Van Flein said that Plaintiff would have to "carry the collateral" of filing a complaint and admitted to being "conflicted between accountability for him and protection for you." Van Flein openly acknowledged

that initiating the process would likely expose Plaintiff to retaliation, reputational harm, and professional risk, and that the University had no concrete or reliable safeguards that would prevent such harm.

70. Plaintiff was pressured by an administrator to abandon her complaint. Rich Collins, the former Dean of the Graduate School, suggested that Plaintiff should "remove herself from the situation" by leaving UAF with only a master's degree and transferring to a different institution to complete her doctorate.

**Plaintiff Was Harmed by the University's Botched Investigation**

71. Because of the University's botched investigation and its failure to enforce the "no contact" directive and failure to offer appropriate supportive measures, Plaintiff felt unsafe on campus and during field work and was forced to adjust her own schedule. Plaintiff limited her access to campus, colleagues, and her advisor, instruments needed for her work, and access to the field, in order to avoid potential encounters with Sturm. For example, in March 2025, Plaintiff was forced to modify her field work schedule and lost an opportunity to collaborate with colleagues. Thus, during the University's unreasonably long investigation, Plaintiff was forced to bear the entire burden and consequences of the University's "no contact" directive, which was ostensibly intended to protect Plaintiff from ongoing harassment and retaliation by Sturm.

72. Plaintiff lost out on opportunities to attend lectures, seminars, conferences, networking events, field work, authorship opportunities, and job opportunities as a result of the University's failure to offer and enforce appropriate interim supportive measures.

73. The University's botched investigation and its failure to prevent further

harassment and retaliation by Sturm has caused the Plaintiff economic damages, by harming her professional reputation, career, and intellectual property rights.

74. The University's botched investigation and its failure to prevent further harassment and retaliation by Sturm has also had a severe emotional and psychological toll on Plaintiff. Plaintiff was forced to choose between maintaining her safety and completing the fieldwork necessary for her dissertation. Plaintiff was left in a constant state of fear, anxiety, and distress. As a result of the years working in an unsafe and unhealthy environment, Plaintiff has been diagnosed with and suffers from ongoing PTSD, sleeping disorder, and stress-related physical symptoms.

## CLAIMS FOR RELIEF

## COUNT I

### VIOLATION OF TITLE IX OF EDUCATION AMENDMENTS ACT OF 1972 (20 U.S.C. §§ 1681–89, 34 C.F.R. §§ 106.1 *et seq.*)

75. Plaintiff repeats and incorporates by reference the allegations in each of the preceding paragraphs.

76. Congress enacted Title IX of the Education Amendments Act of 1972 with the purpose of eliminating discrimination on the basis of sex in any education program or activity that receives federal financial assistance. *See* 20 U.S.C. § 1681(a); 34 C.F.R. § 106.1.

77. During all relevant times, the University has received federal funds and is therefore a "recipient" subject to the requirements of Title IX. *See* 34 C.F.R. § 106.2.

78. Plaintiff suffered discrimination by Sturm on the basis of her sex that was

so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to the educational opportunities and benefits provided by the University.

79. The University exercised substantial control over Sturm and the context in which the discrimination occurred.

80. One or more University officials with authority to address Sturm's discrimination and institute corrective measures had actual knowledge of the discrimination and failed to respond adequately.

81. The University acted with deliberate indifference to Sturm's discrimination, such that the University's response to the discrimination or lack thereof was clearly unreasonable in light of the known circumstances.

82. The University failed to respond promptly and effectively to Plaintiff's complaint of discrimination by Sturm. The University's response was so delayed and inadequate that it amounts to deliberate indifference to discrimination.

83. The University's investigation of Plaintiff's discrimination complaint failed to comply with Title IX's implementing regulations and its own policies and regulations, which reflects an official decision not to remedy the discrimination.

84. The University's delayed response to Plaintiff's discrimination complaint prejudiced the Plaintiff.

85. The University failed to treat Plaintiff equitably during its investigation of Plaintiff's discrimination complaint.

86. The University failed to offer Plaintiff reasonably available interim supportive measures during its delayed investigation of Plaintiff's discrimination

complaint.

87. The University's deliberate indifference subjected Plaintiff to continued discrimination and retaliation by Sturm and/or made Plaintiff vulnerable to it.

## COUNT 2

## VIOLATION OF AS 14.18.010

88. Plaintiff repeats and incorporates by reference the allegations in each of the preceding paragraphs.

89. The Alaska Legislature has recognized "the benefit to the state and nation of equal educational opportunities for all students, and equal employment opportunity for public education employees . . . ." AS 14.18.010. Accordingly, the legislature has prohibited discrimination on the basis of sex against any student in public education in Alaska. *See id.* "A person in the state may not on the basis of sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal or state financial assistance." *Id.*

90. A student in postsecondary education who has been the victim of discrimination on the basis of sex "has an independent right of action in superior court for civil damages and for such equitable relief as the court may determine." AS 14.18.100.

91. The University's treatment of Plaintiff's complaint against Sturm constitutes discrimination on the basis of sex in violation of AS 14.18.010.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

(1) An award of economic and non-economic damages;

(2) An award of pre- and post-judgment interest;

(3) An award of full reasonable attorney's fees;

(4) An award of the costs and expenses of litigation;

(5) All other proper relief that is just and equitable under the circumstances.

DATED this 30th day of January, 2026.

NORTHERN JUSTICE PROJECT, LLC
Attorneys for Plaintiffs

By: /s/ Goriune Dudukgian
Goriune Dudukgian, ABA No. 0506051